ALBANY,<br>Feb. 1811.<br><br>TENET<br>v<br>PH. INS. Co.

---

TENET *against* The PHOENIX INSURANCE COMPANY.

THIS was an action on an open policy of insurance, dated *November* 19, 1807, on the *American* ship *Calliope,* from *New-York* to *Bordeaux.* The policy contained the following clause: " Warranted *American* property, proof to be required here only; also warranted not to abandon, if detained or captured, until after a detention of six months, unless previously condemned; nor if refused admittance, or turned away, but may proceed to another near open port."

The cause was tried at the *New-York* sittings, in *December,* 1809, before Mr. Justice *Yates.*

It was proved, that the plaintiff, at the time of the insurance, was the owner of the ship, which was registered in his name, and the register produced at the trial, and her value was proved to the amount of the sum subscribed. In *February,* 1808, the plaintiff assigned the ship and the policy of insurance, to Messrs. *Jumel &*

A vessel was insured from *New-York* to *Bordeaux.* The policy contained the following clause; " Warranted *American* property, also warranted not to abandon if detained or captured until after a detention of six months, unless previously condemned; nor if refused admittance or turned away, but may proceed to another near open port." The vessel, within about 20 leagues of the Isle of *Oleron,* or the mouth of the *Garonne,* met a British squadron of five sail, and was

boarded by one of the squadron, and informed that all the ports from *Russia* to the *Dardanelles* were blockaded by *British* ships, and the master was warned, that if he attempted to enter any port under the influence of *France,* his vessel and cargo would be liable to capture and condemnation by the *British;* and he was told, that he must either go to *England* or *Malta,* or return to *America.* Not having sufficient water to return to *America,* the master, after consulting his officers and crew, shaped his course for *England,* with intention to reach *Falmouth, Plymouth,* or *Guernsey;* but springing a leak, and meeting with violent and adverse winds, he was compelled by necessity, for the preservation of the ship, &c. to go into *L'Orient,* where the vessel and cargo were seized by the *French* government. It was held, that, notwithstanding the existence of the *Berlin* decree, the ports of *France* were not to be considered as shut, as it regarded the ship insured; that the terms *near open port* must be understood in a geographical sense; that neither of the *English* ports was to be considered as a near port to *Bordeaux;* and that the attempt of the master to reach a port in *England* was a *deviation,* which put an end to the policy.

*Desobry*, who, on the 30th *June*, 1808, wrote a letter of abandonment to the defendants, in which they state, that they enclosed to the defendants certain letters received concerning the *Calliope*, the policy, and proofs of interest, and that, if any other proofs on the subject were wanting, they were ready to furnish them, on the intimation of the defendants. That a total loss having ensued by reason of the perils insured against by the policy, they thereby abandoned the said ship to the defendants, and claimed a total loss, and offered to execute any assignment to the defendants which they might require. On the 16th *August*, 1808, *Jumel & Desobry* wrote another letter to the defendants, stating that some doubts existing whether their abandonment on the 30th of *June* was not premature, and enclosing the information they had received, they again abandoned for a total loss, which had ensued by reason of the perils in the policy, &c. The information communicated, consisted of a letter from the captain of the *Calliope*, dated *January* 1, 1808, at *L'Orient*, and a letter dated the 6th of *March*, 1808, from their correspondent at *Bordeaux*, stating what had occurred, and that the ship had arrived at *L'Orient*, where she had been seized and put under sequestration by the officers of government, &c. On the 14th *October*, 1808, Messrs. *Jumel & Desobry* addressed another letter to the defendants, enclosing the *protest* of the *Calliope*, made the 1st of *October*, 1808, before a public notary at *New-York*, renewing their abandonment, and demanding payment for a total loss.

From the deposition of the master, read in evidence at the trial, the following facts appeared. The *Calliope* sailed from *New-York* the 29th of *November*, 1807, with a cargo of sugar, cotton, codfish, oil, coffee, logwood and deer skins, and met with heavy gales of wind during her passage, and, on the 28th of *December*, 1807, being about twenty leagues from the island of *Oleron*, she fell in with a squadron of five *British* ships of war, under

the command of Sir *Richard Strachan*, and was boarded by the *Emerald* frigate, one of the squadron, the lieutenant of which asked the master of the *Calliope* if he did not know that the whole continent of *Europe* was blockaded by *British* ships of war, from the *Dardanelles* to *Russia*, and informed him, that if he attempted to enter any port whatever under the influence of *France*, the *Calliope* and her cargo would be subject to capture by any *British* cruiser, and be liable to condemnation, as lawful prize. The following endorsement was then made on the register and sea-letter of the *Calliope*, by the lieutenant of the *Emerald*: " All *French* ports, as well as those under *French* influence, being under a strict blockade, you are hereby warned not to enter any such ports. If found so doing after this warning, you are liable to be seized and sent to *England*, and condemned as lawful prize." On being asked to what port he would go, the master of the *Calliope* answered, that not being permitted to go to *Bordeaux*, he would proceed for *Lisbon*, or some port in *Portugal*. But he was told by the officer, that the *French* were in possession of that country. He then asked to what port it was possible to go; and the officer replied, that he must either proceed to *England*, or *Malta*, or return to *America*. The master of the *Calliope* not having a sufficiency of water to return to *America*, it was determined, after a consultation with the officers and crew of the *Calliope*, as there was a strong south-west wind, to proceed for *Falmouth*, *Plymouth*, or *Guernsey*; and they accordingly directed their course for *England*; but the next day the ship sprung a leak and made much water, and the weather was very tempestuous during the 29th and 30th *December*, so that she could carry very little sail. On the 31st of *December* they experienced violent gales of wind from the west-north-west and west-south-west, with a heavy sea, so that the leak increased; and being

in latitude 47 degrees and 42 minutes north, and 5 degrees west longitude, the master consulted the officers and crew as to what was best to be done, and they were unanimously of opinion that it was absolutely necessary, for the preservation of their lives, and for the interest of all concerned, to abandon the attempt of reaching an *English* port, and to bear away for the first port they could reach in *France.* They accordingly bore away for *L'Orient*, as being the nearest port, where they arrived in the afternoon of the 31st of *December.* The ship was ordered to *quarantine*, and on the 3d of *January*, 1808, the ship and cargo were seized by the officers of government, and seals put on the hatches. The master made a protest before the *American* consul, but did not state his attempt to go to *England.* The ship and cargo continued under arrest, and, on the 9th of *April*, the cargo was landed and deposited in the public stores, subject to the order of the government. On the 4th of *May*, the *Calliope*, under the direction of the officers of government, was completely dismantled and laid up. The master, seeing no prospect of the ship and cargo being released, went to *Nantz*, from whence he sailed, on the 12th of *June*, for *New-York*, where he arrived about the 1st of *October.* The master also testified, that he was about twenty leagues from the mouth of the *Garonne* when he was boarded by the *British* frigate, and that, from what he was informed by the boarding officer, as well as from information derived from other sources, while at *L'Orient*, he believed that river to be actually blockaded on the 28th of *December*, 1807, and that no *American* vessel could have proceeded to *Bordeaux*, without great danger, and almost a certainty of being captured by the *British* squadron then stationed off the mouth of the *Garonne;* that he had written instructions from the plaintiff relative to the voyage, and was directed to proceed to *Bordeaux*, consigned to Mr.

ALBANY,
Feb. 1811.

TENET
v.
PH. INS. Co.

*Sourde*, of that place; and that, in case it was blockaded, he was directed to proceed to the next near open port, and not to attempt to violate the blockade. That he applied to a *French* merchant at *L'Orient* for his assistance and advice, but who, was a stranger to the plaintiff, and he left with him a power of attorney to claim and recover the ship and cargo.

It was proved by a master of a vessel, that according to the courses and the winds, as stated by the master in his deposition, the *Calliope*, after being boarded by the *English* frigate, pursued the direct route for *England*, and was in that route when she came opposite *L'Orient*, and that in the state of the winds at that time, it was impossible to reach *England*, and *L'Orient* was the best and nearest port of safety ; that if the *Calliope* had not intended to go to *England*, she would have gone into *Nantz*, having passed that place before she came to *L'Orient*, *Nantz* being much nearer to *Bordeaux* than *L'Orient*.

The counsel for the defendant moved for a nonsuit, 1. Because there was not evidence of an actual blockade of *Bordeaux;* 2. Because there was not a turning away, within the meaning of the policy; 3. Because, before the detention, the voyage had been abandoned, and the underwriters discharged from further risk. The judge granted the motion on the ground that there was not evidence that *Bordeaux* was, in fact, blockaded, at the time the *Calliope* was warned off by the *British* frigate. The counsel then agreed that a verdict should be taken for the plaintiff, subject to the opinion of the court; and if the court should be, of opinion that the plaintiff ought to be nonsuited, then a judgment of nonsuit was to be entered; otherwise a judgment was to be entered for the plaintiff.

*Hoffman* for the plaintiff. The preliminary proofs were sufficient. It was not necessary to show in the

first instance, that the vessel was still detained, after the expiration of the six months. It is enough that the fact was made to appear at the trial. If the assured cannot abandon, at the end of six months, without proving that the vessel is still detained, it may be 9, 12, or even 18 months, in many cases, before he could exercise this right.

If there was any evidence of the blockade of *Bordeaux*, it ought to have been left to the jury, for them to decide as to the fact. The plaintiff ought not to have been nonsuited. We contend there was sufficient evidence of a blockade. There was a proclamation, and a squadron of five sail cruising off the port, and the vessel was boarded by one of the squadron, and warned off. There was an absolute turning away from the port, so that the insured were at liberty to enter another near open port; and he was justified in seeking such a near port as he might enter with safety.

*T. A. Emmet*, contra. 1. The last abandonment was made the 14th *October*, and the defendants were entitled to the original protest of the master, made at *L'Orient.* The preliminary proof does not show that *Bordeaux* was blockaded. It was a mere paper blockade of the whole continent of *Europe.* The prohibition to enter did not regard *Bordeaux* more than any other port. It was general as to all the ports of the continent. The abandonment does not state any particular cause of loss; but speaks generally of a loss by the perils of the sea. To render an abandonment valid, the true cause of loss must be stated.* How can the insurer act, in consequence of the abandonment, if the precise and true ground of it is not stated? To render the clause requiring preliminary proof useful or operative, the insured ought to set forth the specific causes of the abandonment.

2. There was not evidence of a blockade sufficient

*1 *Johns. Rep.*
191.

to carry the cause to a jury. The master states, that from what he was informed by the boarding officer, as well as from information derived from other sources, while at *L'Orient*, he believed the *Garonne* to be blockaded. Nothing can be more loose and vague. General rumours of a blockade are not sufficient. Subsequent information at *L'Orient* cannot justify a previous abandonment of the voyage. In *Schmidt* v. *The United Insurance Company*,* the master was informed by two different cruisers, at different times, that the *Elbe* was blockaded, and she was warned not to proceed to *Hamburgh*, and information of the blockade also existed at *New-York;* and yet this has been considered as very light evidence of an existing blockade. In *Radcliff* v. *The United Insurance Company*,† it was held that a knowledge of the existence of the blockade should be brought home to the party. There must be either a public notice to the country of the neutral, or notice to the individual. A *turning away*, within the meaning of the clause in the policy, is the act of a *blockading* squadron. A refusal of admittance is the act of the government at the port of destination. Unless there is an actual existing blockade, there can be no turning away, in the sense of the contract between the parties. It must be done by a power having the right to turn away, by the law of nations. There was no warning as to the port of *Bordeaux* being a blockaded port. It was a general warning as to all ports belonging to the enemies of *Great Britain*, from *Russia* to the *Dardanelles*. Such a notice or warning can never be considered as legitimate in this country. But admitting, for a moment, that the *Calliope* was turned away, the master was not justified in going to *England*. He was bound to go to the next open port, or the next port not blockaded. His departure, therefore, for *England*, was an abandonment of the voyage, or a *deviation*.

ALBANY,
Feb. 1811.

TENET
v.
PH. INS. Co.

* 1 *Johns. Rep.* 219.

† *Ante*, 98.

Vol. VII. 3 A

ALBANY,
Feb. 1811.

TENET
v.
PH. INS. CO.

* 6 Johns. Rep.
226.

*Wells*, in reply. In *Craig* v. *The United Insurance Company*,* it was expressly decided that the protest of the captain was not an essential part of the preliminary proofs. But when the plaintiff in the letter of abandonment offered to furnish other evidence, if required, the defendants should have asked for the protest, if they thought it necessary.

It is not requisite to show a blockade in fact. It is enough if the vessel was turned away by a power she was unable to resist. If all the ports in *France* were blockaded, then *Bordeaux* was included. The situation of a *British* squadron cruising off the mouth of the *Garonne*, affords the irresistible inference, that it was there for the purpose of blockading *Bordeaux*. But if it was not a squadron actually stationed for the purpose of a blockade, but cruising on some naval expedition; yet being off the port of destination, and in the very track of the *Calliope*, and she being ordered away under the penalty of capture and confiscation, there was the interposition of that superior force, which justified the master in going to another port. In the case of *Schmidt* v. *The United Insurance Company*, slighter evidence of a blockade was permitted to go to the jury.

But it is said there was a *deviation*. The insured had liberty to go to a *near open port*. The master was not bound to go to the nearest port. The master might, therefore, exercise his discretion, as to which was a near open port. The *Berlin* decree was then in full force. No *French* port under that decree could be an open port to the *Calliope*, after being boarded by an *English* ship. An *open* port is one which may be entered with safety, and where the cargo may be sold and disposed of with security. There was then no open port nearer than *England*. The master was forced by necessity to go into *L'Orient;* it was not a matter of choice. It would have been folly to have elected to go into a *French* port, with a moral certainty of seizure and

condemnation. The insured was at liberty to go to a near open or safe port; and that port was in *England.*

SPENCER, J. delivered the opinion of the court. It will not be necessary to consider the points arising from the preliminary proofs, and the abandonment; admitting the evidence to have sufficiently established both those points, still the plaintiff is not entitled to recover. Nor is it essential to discuss the point of the blockade, *de facto*, of *Bordeaux.* Whether that port was blockaded or not, the facts show that the *Calliope* was prevented, by the presence of a *British* squadron, from entering the port of destination. There was therefore a turning away, within the terms and spirit of the policy, and consequently there existed a right on the part of the assured to proceed to another *near open port.* The policy precludes an abandonment for refusal of admittance, or a turning away. The questions then are, whether the *French* ports in the neighbourhood of *Bordeaux* are to be considered open ports, within the purview of the policy; and if so, then, whether the ship did not deviate before her arrival at *L'Orient?*

It was conceded on the argument very properly, that the *Milan* decree could have no influence on the question, because it was not known to the captain, and he did not act with a view to it. If the ports of *France* are to be considered as not open ports, it must be under the *Berlin* decree. That decree was passed on the 21st of *November*, 1806, and this policy was underwritten on the 19th of *November*, 1807. The only articles of the decree which have any bearing on the question, are the 5th and 7th. The former forbids trading in *English* merchandise; and all merchandise belonging to *England*, or coming from its manufactories or colonies, is declared lawful prize. The latter declares that no vessel coming directly from *England*, or from the *English* colonies, or having been there, after the publica-

tion of the decree, shall be received in any port. The *French* ports then were not shut, except as to neutral vessels so circumstanced as to come within the cases mentioned in the decree. When, therefore, we perceive that the voyage is *from New-York to Bordeaux;* that the property is warranted *American;* and that the policy was effected one year after the promulgation of the *Berlin* decree, it is certain, that in the contemplation of the parties, the ports of *France* were not considered shut to this ship. The policy is on the ship, and we cannot intend that the cargo she was to carry out would bring her within the decree. On the contrary, the intendment is, that such cargo would be laden on board as was admissible under the decree; the parties acting under a full knowledge of its provisions. With respect to this ship, then, we consider the ports of *France* as open ports.

The terms *near open port,* must be considered as used in a geographical sense, and not as depending on a facility of reaching a distant port if the wind should happen to be favourable. They admit of some latitude, but still there must be a limitation. If, therefore, it be conceded, that *L'Orient* comes within the expression of a near open port, in reference to *Bordeaux,* the port of destination, it is, perhaps, as great an extension of the import of the words as ought to be allowed. We are of opinion that neither *Falmouth, Plymouth,* nor *Guernsey,* can be considered near ports to *Bordeaux;* and, consequently, that an attempt to reach either of those ports was a deviation, if the ship was wide of the usual course of a voyage from *Bordeaux* to *L'Orient.* That she was out of the common and usual *iter,* is very clear from the evidence; for after she was boarded and had her register endorsed, she set out for *England,* and during two or three days was beating against the wind, with a view to reach an *English* port; and when it was determined to abandon the attempt from the

stress of weather, and the leaking of the ship, she reached *L'Orient* by putting herself, in fact, before the wind. When the resolution was adopted to abandon the attempt to gain an *English* port, the ship was in latitude 47 degrees 42 minutes north, and in longitude 5 west, and it is perfectly clear from an examination of the charts, that, at that time, the ship was entirely out of her course from *Bordeaux* to *L'Orient*. Here then was a deviation, and consequently an end of the policy; and the underwriters are not answerable for the subsequent loss, to whatever cause it may be attributed.

Judgment of nonsuit.